BUTLER et al., Respondents, v. MURPHY et al., Appellants.

St. Louis Court of Appeals, April 12, 1904.

EQUITY: Specific Performance. A contract whereby the applicant for a patent, without means to operate it, agreed with another that if the latter as agent would form a company to own and operate the patented device, retaining for the applicant one-half the stock, he would give the agent one-half his portion as a compensation, should be specifically enforced where the agent successfully organized a corporation according to agreement, although the patent when applied for was suffered to lapse and a patent taken out on a similar device with which the company operated, and another corporation of broader scope and more capital was organized and received from the first a transfer of the property. The assignee of the agent was entitled to a decree giving him one half the patentee's stock in the first corporation.

Appeal from St. Louis City Circuit Court.—*Hon. Robert M. Foster,* Judge.

AFFIRMED.

*J. A. Talty* and *J. M. Holmes* for appellants.

(1) The terms of the contract sought to be enforced must be clear, certain and positive, and free from all doubt and ambiguity. A greater degree of certainty is required in a contract sought to be specifically enforced in equity than is necessary in a contract which is to be the basis of an action at law for damages. Paris v. Halley, 61 Mo. 453; Mastin v. Halley, 61 Mo. 196; Belch v. Miller, 32 Mo. App. 387; Taylor v. Williams, 45 Mo. 70; Underwood v. Underwood, 48 Mo. 527. (2) The next requirement of a court of equity is that the party seeking the specific enforcement of a contract must show that he has performed all things necessary to be done and performed by him. It is not sufficient that he has performed a part of it. Rosenberger v. Jones, 118 Mo. 559; El. S. S. Co. v. Gill & Co., 125 Mo. 140. (3) When a court of equity is called upon to specifically enforce the performance of a contract, the proof of which rests wholly or in part upon parol evidence, that evidence must be of so clear and forcible a nature as to leave no room for reasonable doubt in the mind of the chancellor. Nothing should be left to conjecture, and but little to probabilities. Stevenson v. Adams, 50 Mo. 475; Sitton v. Shipp, 65 Mo. 297; Railroad v. McCarty, 97 Mo. 214; Veth v. Gierth, 92 Mo. 97; Tedford v. Trimble, 87 Mo. 226; Strange v. Crowley, 91 Mo. 287; Taylor v. Von Schroeder, 107 Mo. 206; Tapham v. Dreisvogt, 36 Mo. App. 275.

*Hugh D. McCorkle* and *Henry M. Walsh* for respondents.

GOODE, J.—The defendant, Thomas M. Murphy, is the patentee of an improved street sprinkling machine and street washer. He had been working on this invention prior to 1893, and applied for his first patent December 26th of that year. The patent was granted by the patent office, to be issued upon the making of a final payment of $80 to said office. Meanwhile several years passed and nothing was done towards utilizing the invention in a practical way. Murphy was very poor and had not the money to present his invention to the public and induce its use to an extent that would be profitable. F. C. Mitchell was his brother-in-law and the families of both men resided in St. Louis and were on intimate terms. Mitchell had been active in promoting the use and sale of other patented devices, so Murphy asked him to take hold of his sprinkling machine and interest men of means in it. A sprinkling wagon of the type invented by Murphy was used at the fair grounds in the city of St. Louis with good results. Mitchell called the attention of Chas. S. Dusard to this machine and negotiations ensued which resulted in an agreement dated December 18, 1899, and signed by Murphy, Mitchell and Dusard of a tenor similar to the one to be immediately copied, except that Dusard was a party and given an interest by it. Efforts were made to form a company under that agreement but it lapsed before anything was achieved, as it was to continue only about three months, and time was of its essence. It is the contention of the respondents that shortly after the date of its expiration, the following contract was entered into by Murphy and Mitchell:

"This memorandum of agreement, entered into this date by and between Thomas M. Murphy, party of the first part, of the city of St. Louis, State of Missouri, and F. C. Mitchell, ————, parties of the second part, of the city of St. Louis, State of Missouri, witnesseth:

"Sec. 1. That whereas the party of the first part

has a patent sprinkler, and is desirous of having a company formed to own and operate same, he agrees and by these presents binds himself to turn over to said company, when formed, all rights, title and interests in and to said patents for one-half of the capital stock of said company when formed.

"2d.   And said party of the first part hereby agrees and binds himself to employ, and by these presents does employ F. C. Mitchell, — — — —, parties of the second part, to form said company in his name and to make all arrangements needed to successfully form said company, and, after said company has been formed, to turn over to said parties of the second part, as compensation or commission for their labor in forming said company, an undivided one-half of all stock or moneys that may be set over to him, or at his direction, by the forming of said company by said parties of the second part.

"3d.   That whereas all the parties hereto are desirous of acting in harmony and as a unit of one, it is hereby agreed by all parties hereto, that they will not sell or offer to sell any part of their stock without offering to sell to parties in this agreement, and they to have ten days' refusal of same from time offered at a price offered on the open market; and that they further agree to appoint one of their number to vote all their stock at each annual meeting, and to execute power of attorney to the one so selected.

"This contract to expire July 1, 1900, if a company has not been formed or in course of formation.

"In witness whereof we have attached our hands and seals.                    "THOMAS M. MURPHY,
                                 "F. C. MITCHELL."

The use of the word "parties" in the foregoing agreement is accounted for by testimony that the former Dusard contract was copied with Dusard's name omitted.

Appellants deny that any such agreement as the foregoing was ever made, or any other agreement of

that cast except the Dusard one, though Murphy admits that he had an understanding with Mitchell that the latter was to borrow some money on the patent, in order to introduce it, and was to be compensated for that service.

According to the testimony for the respondents, Mitchell, after the execution of the agreement copied above, managed to interest the respondent, William Ratican, in Murphy's patent, and an arrangement was effected by which a corporation was to be formed with a capital stock of $5,000, in payment of which Ratican was to furnish $2,500 and Murphy the other $2,500, by conveying to the company his patent. It is certain that a corporation of that kind was formed under the name of the Hydro-Pneumatic Sprinkler and Manufacturing Company, having a capital stock of fifty shares of $100 each, the total capital stock being $5,000. Twenty-five shares were issued to William Ratican, one to Thomas M. Murphy and twenty-four to Fred T. Murphy, who is a son of Thomas Murphy and held those shares as trustee for his father without having paid anything for them. Articles of incorporation of said company were executed May 25, 1900, and a certificate of incorporation was issued shortly afterwards. The following assignments of Murphy's patent to said company were executed:

"In consideration of the sum of $10 to me paid by the Hydro-Pneumatic Sprinkler and Manufacturing Company, a corporation organized under the laws of the State of Missouri, U. S. A., and having a place of business in the city of St. Louis, in said State, I do hereby sell and assign to the said Hydro-Pneumatic Sprinkler and Manufacturing Company all my right, title and interest in and to my invention in new and useful improvements in pressure tanks, as fully set forth and described in the specification which I have signed preparatory to obtaining a patent; and I do hereby authorize and request the commissioner of patents to issue

said patent to the Hydro-Pneumatic Sprinkler and Manufacturing Company in accordance with this assignment.

"Witness my hand and seal this 30th day of April, 1901, at the city of St. Louis.

"THOMAS MICHAEL MURPHY."

"Whereas, Thomas M. Murphy of the city of St. Louis, and State of Missouri, has invented a new and useful improvement in sprinkling tanks, as fully set forth and described in the specification filed by him on the twenty-sixth day of December, 1893, preparatory to obtaining letters patent of the United States therefor, serial No. 494666.

"And whereas, the Hydro-Pneumatic Sprinkler and Manufacturing Company, a corporation of the city of St. Louis and State of Missouri, is desirous of acquiring an interest in said patent and invention,

"Now, therefore, to all whom it may concern, be it known that for and in consideration of twenty-five hundred dollars to me in hand paid, the receipt of which is hereby acknowledged, I have assigned, sold and set over, and by these presents do assign, sell and set over unto the said Hydro-Pneumatic Sprinkler and Manufacturing Company, a corporation, its successors and assigns, the whole of all the right, title and interest which I have in said patent and invention.

"And I do hereby authorize and request the commissioner of patents to issue the said letters-patent to the said Hydro-Pneumatic Sprinkler and Manufacturing Company, a corporation, in accordance with this assignment.

"In testimony whereof, I hereunto set my hand and affix my seal this first day of June, nineteen hundred.

"THOS. M. MURPHY.     (Seal)"

It must be remembered that at that time, though Murphy's application for letters-patent had been granted by the patent office, they had not been issued yet for want of final payment, and in fact never were

issued on that application, because the period for their issuance lapsed before final payment was made. After the incorporation of the Hydro-Pneumatic Company, Mitchell claimed his stock in it pursuant to the agreement between him and Murphy; but according to the testimony for the respondents, Murphy refused to recognize the agreement, saying he had a family to support and could not afford to part with so much of the stock and asking Mitchell to accept a salaried position with the company in lieu of the shares he was entitled to under the contract. Murphy denies there was such a contract or that Mitchell was entitled to the shares; but several disinterested witnesses swore they read the contract. To protect his rights, Mitchell served a written notice on Ratican, informing him of the contract he had with Murphy, dated April 5, 1900, which entitled him to twelve and one-half shares in the Hydro-Pneumatic Company, and ordering him not to deliver those shares to Thomas M. Murphy or his son Fred, or to any one else, but Mitchell; but the stock had already been issued to the Murphys.

Just here we will state the drift of the testimony in regard to what became of the contract of April 5th between Mitchell and Murphy. The first meeting of Ratican, Mitchell and Murphy to arrange for the incorporation of the Hydro-Pneumatic Company, occurred at Ratican's office one evening about the middle of May. Mitchell always carried the memorandum of the contract between him and Murphy in his coat pocket, and when he retired that evening he threw his coat over the back of a chair in a way that exposed the paper to view. As Murphy now felt that the introduction of his device and its general use, were assured by the arrangement with Ratican, he regretted having given Mitchell so large an interest in his patent and conceived a purpose to evade the effect of what he had done. Accordingly, the morning after the meeting to incorporate, he called at Mitchell's residence while members of the family were

eating breakfast in the kitchen, said a few words to them, then passed out through the room where Mitchell's coat lay on a chair, and, as he did so, abstracted the contract from the pocket of the coat. As soon as its loss was known, Mitchell took steps to protect his rights. Murphy's sister, Mrs. Reid, swore that, about the time the contract was lost, Murphy called at her house and was agitated about Mitchell's claim. He had a paper clutched in his hand and she saw him open the door of a stove in her residence and throw the paper into the fire. This witness's testimony leaves an impression that Murphy on that occasion burned the agreement between him and Mitchell. She said her brother spoke of Mitchell accusing him of stealing the paper from his pocket and declared that Mitchell had altered it so as to make it altogether different from the true agreement. Murphy denied burning any paper and said he merely opened the stove and spat in it.

The Hydro-Pneumatic Company held several meetings, built some sprinkling machines, applied for foreign patents, and did other business. For one thing, it authorized the sale of the patents it held in the several European countries, employed Frank Ottofy, an attorney, to make sales, and gave him a half-interest in those foreign patents. At several meetings of the directors of the Hydro-Pneumatic Company, namely, William Ratican and the two Murphys, mention was made of a device to be attached to a sprinkling machine and used for washing streets, which Thomas M. Murphy expected to patent. The minutes of a board meeting of January 2, 1901, recite that said Murphy reported he was not yet ready with the washing attachment and that he was instructed to proceed further toward its completion. In the minutes of the meeting held February 18, 1901, we find a recital that said washing attachment had been completed and after being inspected by the president and the full board, was approved and adopted. Subsequently, May 7, 1901, this device was patented at the

expense of the Hydro-Pneumatic Company, and it is the contention of the respondents that it became the property of the said company; and, in truth, it was the only invention on which letters-patent were issued to Murphy. The latter does not deny that he sold a half-interest in it to Ratican for $2,500, but says it never became the property of the Hydro-Pneumatic Company. His testimony on the subject was as follows:

"Now Mr. Murphy, there was only one U. S. patent issued—is not that true? A. That was all.

"Q. And the application for that patent was subsequent to the formation of the Hydro-P. S. & Mfg. Co.? A. Yes, sir.

"Q. That patent was issued to you? A. Yes, sir.

"Q. You sold one-half interest? A. Yes, sir.

"Q. To whom? A. Mr. Ratican.

"Q. For what consideration? A. $2,500.

"Q. I will ask you to state whether or not you and Mr. Ratican with that patent covering the U. S. didn't form another company called the Sanitary Company? A. We sold out to another company.

"Q. (Showing paper.) This is the agreement by which you sold out is it not? A. Yes, we sold out under that contract."

An agreement was entered into by Ratican and Thomas Murphy July 23, 1901, in which an account of their affairs was stated, and it is asserted by the appellants that the Hydro-Pneumatic Company was abandoned then and nothing further done under and by virtue of that incorporation. Meanwhile sixteen wagons with Murphy's sprinkling device on them had been built, and those wagons, the mules, harness and other articles needed for their operation, were owned either by Ratican or the Hydro-Pneumatic Company. In the contract of July 23d, made by Ratican and Murphy, they were treated as the property of the former and it was agreed that he should, at any time within five years, transfer a half interest in them to Murphy on payment of half their

cost; or on payment of their entire cost, should transfer the other undivided half interest to a corporation they expected to organize. It was, therefore, agreed that the title to that property should remain in Ratican, but that he should account to Murphy for half the royalties on the invention each month. The settlement showed a balance, in round numbers six thousand dollars, due Ratican from Murphy. On the day that agreement was executed Murphy and Ratican made an agreement with one Chas. Sutter by which they agreed to convey to said Sutter all their right, title and interest in and to all patents granted to them or either of them based on Murphy's ideas and applicable to street sprinkling or washing, but that their agreement did not embrace patents or rights owned by the Hydro-Pneumatic Company. The contract bound Murphy and Ratican to deposit blank assignments of such rights with the Missouri Trust Company of St. Louis, to be delivered to the directors of a corporation to be formed under the laws of the State of Missouri, with a capital stock of $300,000, and in full payment of said capital stock; but Murphy and Ratican likewise agreed to convey to Sutter three-fourths of the capital stock of the Hydro-Pneumatic Company by blank assignments deposited with the Missouri Trust Company, to be delivered, as above set forth, to the directors of the contemplated corporation. As to the stock in controversy in this suit, the agreement with Sutter provided as follows:

"They (Murphy and Ratican) shall also deposit the remaining one-fourth of the capital stock of said Hydro-Pneumatic Sprinkling and Manufacturing Company, lawfully assigned in blank, with said Missouri Trust Company of St. Louis, to be by it delivered as aforesaid, in the event of and when a final decree shall be rendered in favor of defendants in a certain case wherein Edward Butler, Jr., et al., are plaintiffs, and Thomas M. Murphy et al., are defendants, being cause No. 21313, Series A., now pending in the circuit court of the city

of St. Louis. In the event, however, it shall be finally held and decreed that the plaintiffs in said cause are entitled to said one-fourth of the capital stock of said Hydro-Pneumatic Sprinkling and Manufacturing Company, then the same shall be by the said Missouri Trust Company delivered to them in accordance with the said finding and decree.''

Said contract further provided that when all the shares of stock of the Hydro-Pneumatic Company should be duly assigned and transferred to the proposed new corporation, the patents and property owned by the Hydro-Pneumatic Company should be assigned and transferred to the new company and the old corporation be finally dissolved. The consideration for this agreement on the part of Murphy and Ratican was that Sutter should secure subscribers for 1,348 shares of stock in the proposed corporation, to be paid for in cash at the price of $50,000, should incorporate a company with a capital stock of three thousand shares, fully paid and non-assessable, and deliver 1,502 of said shares to Murphy and Ratican, retain seventy-five shares himself and deliver seventy-five shares to Taylor R. Young, the remaining 1,348 shares to go to the subscribers who paid the fifty thousand dollars in cash. Such are the articles of said contract material in the present case. Subsequently, there was organized the Sanitary Street Cleaning and Sprinkling Manufacturing Co., with a capital stock of $300,000, and Murphy and Ratican each got one-fourth of its shares as provided in the agreement with Sutter.

Mitchell moved away from St. Louis. He was unable to enforce his rights and subsequently sold and assigned his interest in the contract which Murphy had given him, entitling him to one-half of whatever shares of stock Murphy got in any company which Mitchell might form to handle his invention, to Henry M. Walsh, who in turn sold and assigned a one-half interest therein to the respondent Edward Butler, Jr. This action was

instituted by those parties as assignees of Mitchell's rights, to compel the enforcement of the agreement Murphy had made with Mitchell; that is, to compel Thomas M. Murphy and Frederick T. Murphy, to assign and transfer to the respondents an undivided one-half interest in the stock held by them in the Hydro-Pneumatic Company, so that the title to those shares might be vested in the respondents; to compel said company to enter respondents' names on their books as the holders and owners of those shares; to restrain any disposition of the title or ownership of the stock in prejudice of the respondents' rights, and for other proper relief.

It should be stated that Murphy's shares in the Hydro-Pneumatic Company had been pledged to Ratican for $400 and respondents pray to be allowed to redeem the shares from that pledge.

The decree of the circuit court was in accordance with the prayer of the petition and from it an appeal was taken to this court.

The transcript is very bulky, but we have read it through and find that the weight of the evidence is overwhelmingly in favor of the respondents. There can be no question that Murphy executed the contract with Mitchell, which is the basis of the suit, that he afterwards sought to repudiate it, that Mitchell performed the contract on his part by interesting Ratican in the sprinkling device, promoting the formation of the Hydro-Pneumatic Company and putting the invention on a footing that brought it into use and made it profitable. There can be no question, either, that Frederick T. Murphy holds twenty-four shares of stock as trustee for Thomas M. Murphy, that the latter was insolvent when this suit was brought and that the stock of the Hydro-Pneumatic Company had no fixed or market value but is of peculiar value because of the inventions and patents which it partly owns.

No point which in our judgment possesses the slightest merit, has been made against the propriety of

the court's decree. It is contended that the respondents
are champertous assignees of Mitchell's rights; but there
is no evidence of champerty in the record.    Mitchell had
a right to sell and transfer his interest in the contract to
Walsh for a valuable consideration.    Mitchell declared
on the witness stand that he had no claim against the
respondents of a legal nature for any interest in the
fruits of this litigation; but thought that morally he
might have a claim—in short, was entitled only to what
they would give him.

Appellants say the terms of the contract are vague.
Equity requires, preliminary to specifically enforcing an
agreement, that its terms shall be certain.    We fail to
discern wherein the contract in question falls short of
that requirement.    It is a plain agreement on the part
of Murphy to turn over to a contemplated corporation,
when formed, all his interest in certain patents and one-
half of the capital stock of the company, and to turn over
to Mitchell half of the stock or money he (Murphy)
might receive from the corporation.    The consideration
for his undertaking was services to be rendered by
Mitchell in promoting the company.    A clearer con-
tract could not be made.    There is no ambiguity about
the patents; for the contract itself says the subject-
matter of it is a patent sprinkler which Murphy in-
vented.    In this connection it is urged that Murphy did
not get letters-patent on the sprinkler, but on a street
washer with a cutting edge, and that the new device or
improvement materially increased the value of the orig-
inal invention.    It is true Murphy suffered the first ap-
plication for a patent to lapse, either because he did
not have the money to pay for it or because the street
washer appeared to be more valuable.    That the new
invention was understood by Murphy and Ratican to
be the property of the Hydro-Pneumatic Company, there
can be no doubt, after reading the minutes of the meet-
ings of the directors of that company.    Those minutes
show that Murphy reported to the directors the stage

to which he had advanced in perfecting the street washer, and that both he and the other members of the company, namely, Fred Murphy and Ratican, regarded it as common property. In the minutes of the meeting of January 21st, we find a reference to a communication notifying said corporation of the allowance of "our patents," and in the same minutes it is recited that Murphy reported his invention was an improvement on the original device and said it was still imperfect; and he was instructed to proceed further toward completion. After he perfected it, it was submitted to the board of the Hydro-Pneumatic Company and, after an inspection, was approved and adopted by the board. Besides, the second assignment by Murphy appears to cover it and to have been executed to convey it to the Hydro-Pneumatic Company. It is incredible that such steps would have been taken had it not been thoroughly understood and agreed between Murphy and the other directors of the Hydro-Pneumatic Company that the new attachment, which was, in fact, but an improvement on Murphy's first invention, should be the property of the corporation. The assignment executed by Murphy to the company speaks of it as "my invention in new and useful improvements in pressure tanks, as fully set forth and described in the specification which I have signed preparatory to obtaining a patent." The assignment directed the patent to be issued to the Hydro-Pneumatic Company, and that company bore the expense of procuring the patent. But it is not material in the present controversy who owned the street washer, as the suit is for stock in the Hydro-Pneumatic Company; not for a determination of what property belongs to said company.

The subsequent settlement between Ratican and Murphy, in which there was an apparent abandonment of further proceedings under the Hydro-Pneumatic Company may have been made either to expand the business, or to escape the effect of the contract Murphy

had made with Mitchell.   At all events, the new corporation, the Sanitary Street Cleaning and Sprinkling Manufacturing Company, not only had notice of Mitchell's rights, but effectively protected itself against them by providing that the shares that would go to Mitchell, if he succeeded in his suit, should be held by the Missouri Trust Company in trust and then delivered in accordance with the result of the suit.   But we are not concerned with any proceeding against the Sanitary Company.   The only question in this case is whether Mitchell's assignees are entitled to enforce his right to a half-interest in Murphy's shares in the Hydro-Pneumatic Company.

It is urged again that the enforcement of this contract would be inequitable and unjust.   We think, on the other hand, that all the equities are with the respondents.   Murphy's invention had been in abeyance for years and he had done nothing with it until he procured the help of Mitchell.   He was nearly penniless and on the verge of want.   Mitchell took hold of the matter, got Mr. Ratican, a man of capital, to invest in it and introduce the machine.   The result has been that a corporation with a capital stock of $300,000 is now making use of Murphy's invention and he has a large interest in that corporation.   The inference is fair that he has been lifted from want as the result of Mitchell's work.

It is further said that the corporation which Mitchell promoted, namely, the Hydro-Pneumatic Company did not have capital enough to "own and operate" Murphy's invention and that as the contract between Mitchell and Murphy contemplated the formation of a company to "own and operate" the sprinkling attachment, Mitchell failed to perform, because he failed to organize a company with the requisite capital.   Mitchell promoted a company which both owned and operated sixteen of the sprinklers during its brief career as an active corporation and until a larger enterprise was warranted.   It does not follow because another company of broader

scope was formed, and the rights of the first company transferred to it, that the first one failed to own and operate the sprinkler in the sense contemplated by the contract, between Mitchell and Murphy. Such an extension of capital often follows in the course of handling a successful invention, as it comes into general knowledge and use and meets public favor. The formation of a corporation with a capital stock of $300,000, subscribed by wealthy and sagacious men, bespeaks the success of the efforts of the Hydro-Pneumatic Company to render Murphy's invention commercially profitable. But everything profitable that resulted in the matter can be traced as much to Mitchell's work as to Murphy's invention. There is no doubt in our minds that the decree was for the right party and it is affirmed. *Bland, P. J.,* and *Reyburn, J.,* concur.